# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EUROPEAN ADOPTION CONSULTANTS, INC.,

*Plaintiff*,

v.

MICHAEL R. POMPEO, in his official capacity as U.S. Secretary of State,

*Defendant*.

No. 18-cv-1676 (DLF)

## MEMORANDUM OPINION

In December 2016, the Department of State (the "Department") issued a Notice of Debarment to plaintiff European Adoption Consultants, Inc. ("EAC") under the Intercountry Adoption Act ("IAA"), 42 U.S.C. § 14924 and 22 C.F.R. § 96.85, temporarily barring EAC from performing any intercountry adoption services. In this lawsuit, EAC seeks to set aside the debarment on the grounds that it violated the IAA, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., and the Due Process Clause of the United States Constitution. Compl., Dkt. 1. EAC also seeks reasonable fees and costs, plus interest. *Id.*

Before the Court is Secretary of State (the "Secretary") Michael Pompeo's partial motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b) ("Rule 12(b)"), and partial motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"), *see* Dkt. 17, as well as EAC's cross-motion for summary judgment, *see* Dkt. 27. For the reasons that follow, the Court will grant the Secretary's motions, granting summary judgment to the Secretary on Count I and dismissing Counts II and III, and deny EAC's motion.

## I.  BACKGROUND

EAC is an international adoption agency based in Strongsville, Ohio, Am. Compl., Dkt.

11 ¶ 5, and is "one of the largest, if not the largest," international adoption agency in the United

States, *id.* ¶ 6.  From the time of its founding in 1991, EAC has completed over 8,000

international adoptions for American families, *id.* ¶ 6, and has operated international adoption

programs in China, Poland, India, Colombia, Bulgaria, Uganda, Ukraine, the Democratic

Republic of the Congo, Honduras, and Haiti, *id.* ¶ 7.

In 2000, Congress enacted the IAA, a statute that regulates international adoption

agencies and implements the United States' obligations pursuant to the Hague Convention on

Protection of Children and Cooperation in Respect of Intercountry Adoption (the "Hague

Convention").  The Department of State subsequently promulgated regulations implementing the

IAA's requirements in 22 C.F.R. Part 96.  Pursuant to those regulations, the Department is

authorized to temporarily and permanently debar accredited adoption agencies if it finds that

(1) there is substantial evidence that the accredited agency is out of compliance with the

standards contained in 22 C.F.R. § 96, Subpart F, and (2) there has been a pattern of serious,

willful, or grossly negligent failures to comply with said standards, or there are other aggravating

circumstances indicating that continued accreditation or approval would not be in the best

interests of the children and families concerned.  22 C.F.R. § 96.85.

In or around summer 2016, the Department became aware of a series of complaints

involving EAC.  On December 16, 2016, after reviewing these complaints and other information,

the Department issued a Notice of Temporary Debarment (the "Notice") to EAC.  AR 79.  The

Notice temporarily debarred EAC for a period of three years, cancelling EAC's accreditation to

provide adoption services in connection with Hague Convention adoptions and requiring EAC to

immediately cease engaging in intercountry adoptions.  EAC filed a timely opposition to the

Notice and to its temporary debarment on March 14, 2017.  AR 92.

Following pre-hearing written submissions from both EAC and the Department, the

Department conducted a hearing in October 2017 before a Hearing Officer employed by the

Department's Office of the Legal Adviser.  The Hearing Officer issued her findings of fact and

recommendation on December 12, 2017.  AR 1.  The Hearing Officer found "substantial

evidence that EAC was out of compliance with applicable requirements and that the Department

has proven by a preponderance of the evidence that EAC has engaged in a pattern of serious,

willful, or grossly negligent failures to comply with the regulations," as well as substantial

evidence of "aggravating circumstances indicating that continued accreditation or approval is not

in the best interests of the children and families concerned."  AR 4.  The Hearing Officer

enumerated fourteen separate violations of 42 U.S.C. § 14944 and 22 C.F.R. § 96, Subpart F, that

she concluded the Department had proven by a preponderance of the evidence.  AR 2–3.  In light

of these findings, the Hearing Officer recommended that EAC be temporarily debarred from

December 16, 2016 to December 15, 2019, consistent with the three-year time frame proposed in

the December 2016 debarment notice.  AR 4.

On July 16, 2018, EAC filed this lawsuit.  *See* Compl.  On December 3, 2018, the

Secretary filed a partial motion to dismiss and partial motion for summary judgment.  *See* Def's

Part. Mot. for S.J., Dkt. 10.  EAC filed an amended complaint on December 26, 2018, *see* Am.

Compl., Dkt. 11, and the Secretary filed his partial motion for summary judgment and partial

motion to dismiss the amended complaint on March 12, 2019, *see* Def's Part. Mot. for S.J., Dkt.

17.  EAC filed its cross motion for summary judgment on May 13, 2019.  Dkt. 27.

## II.    LEGAL STANDARDS

### A.    Rule 56

Both parties moved for summary judgment pursuant to Rule 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In the context of the IAA, which explicitly incorporates the APA standard of review, summary judgment requires the court to determine whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). In an "arbitrary and capricious" lawsuit, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006). The core question is whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). An agency action is "arbitrary and capricious" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43.

On "judicial review of agency action, re-weighing the evidence is not the court's function." *United Steel Workers Int'l Union v. PBGC*, 707 F.3d 319, 325 (D.C. Cir. 2013). "Rather, the question for the court is whether there is 'such relevant evidence as a reasonable mind might accept as adequate to support' the agency's finding." *Id.* (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). The court's review is "fundamentally deferential—

especially with respect to matters relating to an agency's areas of technical expertise," *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted). The court will typically sustain an agency action unless the agency has committed a "clear error of judgment." *Marsh v. Oregon Nat'l Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).

### B. Rule 12

The Secretary also moved to dismiss Counts II and III of EAC's amended complaint pursuant to Rules 12(b)(6) and 12(b)(1). Rule 12(b)(6) allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* (internal quotation marks omitted).

Under Rule 12(b)(1), a party may move to dismiss a claim over which the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "When ruling on a Rule 12(b)(1) motion, the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (quotation marks and citation omitted). Because Rule 12(b)(1)

concerns a court's ability to hear a particular claim, "the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). If the court determines that it lacks jurisdiction, the court must dismiss the claim or action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

## III. ANALYSIS

EAC's amended complaint contains three counts, alleging violations of the IAA, the APA, and the Due Process Clause, respectively. *See* Am. Compl. With respect to the first count, the Secretary moved for summary judgment pursuant to Fed. R. Civ. P. 56. *See* Def's Part. Mot. for S.J. at 45. With respect to the second and third counts, the Secretary moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1), respectively. *See id.* The Court will address each count in turn.

### A. Count I

Count I alleges first that EAC's debarment did not comport with the substantive prohibitions of the IAA and its implementing regulations, *see* Am. Compl. ¶ 95–98 (the "Substantive Allegations"), and second that the procedures followed by the Department in debarring EAC violated the IAA or were otherwise "not in accordance with applicable law," *id.* ¶ 100 (the "Procedural Allegations").

### 1. Substantive Allegations

Under the IAA, the Department of State may temporarily or permanently debar an adoption service provider if:

(A) there is substantial evidence that the agency or person is out of compliance with applicable requirements [of the IAA and its regulations]; and

> (B) there has been a pattern of serious, willful, or grossly negligent failures to comply or other aggravating circumstances indicating that continued accreditation or approval [of the adoption agency] would not be in the best interests of the children and families concerned.

42 U.S.C. § 14924(c)(1); *see also* 22 C.F.R. § 96.85. As the Hearing Officer found and as the parties agreed, the phrase "substantial evidence" in the first of these two requirements carries the same meaning as that phrase in the APA. Accordingly, the Department was required to show with "more than a scintilla, but less than a preponderance of the evidence," *Wis. Power & Light Co. v. FERC*, 363 F.3d 453, 461 (D.C. Cir. 2004) (citation omitted), that EAC was out of compliance with applicable statutory and regulatory requirements. As for the second prong, the Department was required to show by a preponderance of the evidence *either* a "pattern of serious, willful, or grossly negligent failures to comply" *or* "other aggravating circumstances indicating that continued accreditation . . . would not be in the best interests of the children and families concerned." 42 U.S.C. § 14924.

The Hearing Officer found that the Department had proven, by a preponderance of the evidence, that EAC committed 14 distinct violations of 42 U.S.C. § 14944 and 22 C.F.R. § 96, Subpart F. AR 2–3. The Hearing Officer's findings of these 14 violations exceeded the requisite threshold of "substantial evidence that the agency . . . is out of compliance with applicable requirements" as well as a "pattern of serious, willful, or grossly negligent failures to comply" *and* "aggravating circumstances indicating that continued accreditation . . . would not be in the best interests of the children and families concerned." 42 U.S.C. § 14924. Because even a small subset of these 14 violations satisfies the statutory threshold, however, the Court addresses only three violations here.

*a. Failure to Report Disruption in Placement*

First, the Hearing Officer found that EAC "violated [22 C.F.R.] § 96.50(d) and (e) and

§ 96.52(a) . . . and the COA Reporting Requirements by failing to remove M[] from her

placement with the [R Parents] once they indicated their intent not to parent M[]," and by failing

to "report the disruption" of the R Parents' adoption while M and the R Parents were still in

Poland. Am. Compl. ¶ 54. Specifically, the Hearing Officer found that the R Parents' adoption

of M "was final on June 27, 2015," and that the R Parents "had decided that they would not

parent M" prior to that date. AR 22. The Hearing Officer based her decision on an email that

Mrs. R herself sent to EAC on June 21. In that email, Mrs. R stated that "[o]ur decision on this

matter is final . . . I don't think it is in ANYONE's best interest to have M come home with us

for even a brief period of time." *Id.* Mrs. R further stated that she was "asking [EAC]

desperately to search for a loving family for [M] now, so that when we get home in two weeks,

she has a possible placement," and that she "[could] []not possibly ask our family to take M." *Id.*

The Hearing Officer concluded that this email was a reliable reflection of "the state of the [R

Parents'] minds at the time," *id.* n.17, and reasonably concluded from the email that the R

Parents had "made their decision by June 21 that they would not parent M," AR 23.

This finding was not arbitrary and capricious. EAC resists this conclusion, alleging that

the "uncontested evidence is that as of the end of the day on June 26, 2015, the R Parents had not

decided to terminate the adoption of M[]." Am. Compl. ¶ 55. But the Hearing Officer

specifically considered the evidence supporting EAC's version of events, namely, a report

submitted by a social worker documenting the social worker's phone call with Mrs. R on the

night of June 26. The Hearing Officer concluded that the social worker's report was less reliable

than the June 21 email from Mrs. R herself because "there is no indication in the record when her

report was made, and it [was] not signed or sworn to." AR 23 n.21. Even taking the statements from the social worker's report at face value, the Hearing Officer determined that those statements were belied by subsequent communications from the R Parents to EAC reaffirming that the R Parents had made a final decision not to parent M. AR 23. The Hearing Officer's weighing of the evidence, and her decision to credit the email from Mrs. R herself over the social worker's account of a separate conversation with Mrs. R, was not arbitrary and capricious. To the contrary, the record clearly contained "such relevant evidence as a reasonable mind might accept as adequate to support the agency's finding." *United Steel Workers*, 707 F.3d at 325 (internal quotation marks omitted).

The Hearing Officer also considered and rejected the argument that a "disruption in placement" requires a cessation of physical custody, AR 23, *see also* Am. Compl. ¶ 55, and the Court agrees with the Hearing Officer's analysis. The regulations define "disruption" as "the interruption of a placement for adoption during the post-placement period." 22 C.F.R. § 96.2. Nothing in the text of the regulations limits a "disruption" to the termination of a client's physical custody over the child. Indeed, the phrase "interruption of a placement for adoption," on its face, easily encompasses a determination by prospective adoptive parents not to move forward with the adoption of a child—the circumstance before the Court here. And this broader definition of the term "disruption" is consistent with the IAA's explicitly stated purpose of "protect[ing] the rights of, and prevent[ing] abuses against, children," 42 U.S.C. § 14901(b)(2), a purpose that would not be well served by strictly limiting the reporting obligations of adoption service providers to the circumstances of a relinquishment of physical custody. The Court agrees with the Hearing Officer that a disruption in placement occurred even though the R Parents never relinquished physical custody of M.

Under the applicable regulations, EAC was obligated to report the disruption in M's placement to the State Department and to relevant foreign authorities. *See* 22 C.F.R. § 96.52(a); 22 C.F.R. § 96.52(e).[1] The regulations also required EAC to "assume[] responsibility for making another placement of the child," 22 C.F.R. § 96.50(d), and to "remove the child" from a placement that "may no longer be in the child's best interests," as well as to provide temporary care under such circumstances, 22 C.F.R. § 96.50(e). It is undisputed that EAC did not fulfill any of these requirements.

### b. Threatening Client for Correcting Fraudulent Documents

Second, the Hearing Officer found that EAC violated 22 C.F.R. § 96.41(e) for threatening Ms. Ro, another prospective adoptive parent, if she insisted on returning to court to correct errors in the adoption paperwork that EAC had submitted. That provision prohibits an agency or person from "tak[ing] any action to discourage a client or prospective client from, or retaliat[ing] against a client or prospective client for: making a complaint; expressing a grievance; providing information in writing or interviews to an accrediting entity on the agency's or person's performance; or questioning the conduct of or expressing an opinion about the performance of an agency or person." 22 C.F.R. § 96.41(e). The Hearing Officer found that EAC employee Debra Parris violated this provision.

This finding was not arbitrary and capricious and was amply justified by evidence in the record. Ms. Ro testified at length regarding her discovery that EAC had submitted fraudulent

---

[1] Section 96.52(e) requires adoption service providers to "take [] all necessary and appropriate measures to perform any tasks in an intercountry adoption case that the Secretary identifies as required to comply with the Convention, the IAA, UAA, or any regulations implementing the IAA or UAA." 22 C.F.R. § 96.52(e). The Policies and Procedures Manual approved by the Secretary of State requires adoption service providers to report any disruption of an intercountry adoption within 30 business days.

documents to a Ugandan court—itself an independent violation of the IAA. *See* 42 U.S.C. § 14944(a)(2) (prohibiting persons from "mak[ing] a false or fraudulent statement, or misrepresentation, with respect to a material fact, or offer[ing], giv[ing], solicit[ing], or accept[ing] inducement by way of compensation, intended to influence or affect . . . a decision or action of any entity performing a central authority function"). Ms. Ro stated that she and her husband "were shocked to learn of the fraudulent documents" and "very scared because we had unknowingly taken fraudulent documents through the Ugandan court." AR 53. According to Ms. Ro, the Ro Parents notified EAC employee Debra Parris of their discovery, "expect[ing] EAC as an agency to be horrified by this fraud." *Id.* Instead, Parris "threatened us with losing our son[;] she said that if we made trouble for [EAC] we would be jeopardizing all adoptions in Uganda." *Id.* That threat clearly operated to "discourage" and "retaliate against" the Ro Parents for continuing to press their "complaint" about EAC's filing of fraudulent documents, in part because that course of action might "question the conduct of" EAC and Mirembe in submitting back-dated documents to a court and "express an opinion about" EAC's tolerance of such conduct. 22 C.F.R. § 96.41(e).

The Hearing Officer did not err in crediting Ms. Ro's interpretation of Parris's comments, of which Ms. Ro was the direct recipient. And as the Hearing Officer made clear, EAC "[did] not offer any evidence contrary to Ms. Ro[]'s statement even though Debra Parris was called by EAC at the hearing and so she had every opportunity to offer contrary testimony." AR 54. The Hearing Officer found Ms. Ro's testimony reliable both because it was "submitted through a detailed, sworn affidavit," and because the testimony centered around her admission that "she did not review the documents submitted on her behalf to the Ugandan court . . . and therefore unwittingly, but perhaps negligently, participated in a fraud upon a court of law." AR 52; *cf.*

Fed. R. Evid. 804(b)(3) (hearsay exception for "statements against interest"). Given Parris's failure to contradict Ms. Ro's testimony and EAC's failure to even call Mirembe to testify, as well as the multiple indicia of reliability attending Ms. Ro's own testimony, the Hearing Officer's decision to credit that testimony was "adequately explained and supported by the record." *N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1181 (D.C. Cir. 2004) (citation omitted).

### c. Failure to Verify Parent's Informed Consent

Third, the Hearing Officer found that EAC "violated 22 C.F.R. §§ 96.14, 96.44, and 96.46 because EAC failed to supervise its providers or to independently verify Ms. J[]'s informed consent to N's adoption." AR 35. That combination of regulations required, in the context of adoptions based upon parental relinquishment or consent, that the primary adoption provider *either* obtain parental consent through a foreign provider subject to the primary provider's supervision *or* independently verify that parental consent was obtained. *See, e.g.*, 22 C.F.R. § 96.44 (requiring primary provider to "provide[] appropriate supervision to supervised providers"); 22 C.F.R. § 96.46(a) (requiring primary provider using a foreign supervised provider to "ensure[] that each such foreign supervised provider . . . [i]s in compliance with the laws of the foreign country in which it operates"); 22 C.F.R. § 96.46(c) (requiring primary provider "using foreign providers that are not under its supervision" to verify that "[a]ny necessary consent to the termination of parental rights or to adoption obtained by the foreign provider was obtained in accordance with applicable foreign law and Article 4 of the [Hague] Convention").

This finding also was not arbitrary and capricious. As the Hearing Officer stated, "EAC introduced no evidence of the steps it took to confirm that Ms. J[] had truly consented to the

adoption of N" beyond the "blanket statement" of one of its agents, Dorah Mirembe, that the child had been approved for adoption. AR 37. The Hearing Officer pointed out that a different EAC employee—who, unlike Mirembe, did testify at the hearing—could not confirm whether a background investigation was conducted prior to N's adoption. *Id.* Furthermore, the Hearing Officer pointed out that "EAC's designated representative and co-coordinator of the Africa program" attended EAC's debarment hearing "without being able to speak as to whether an investigation was conducted on N's background." *Id.* Given the lack of evidence that EAC took action to confirm Ms. J's consent to her daughter's adoption, the Hearing Officer reasonably concluded that EAC either failed to supervise Mirembe as its supervised provider or failed to "verif[y], through . . . appropriate steps, that . . . [a]ny necessary consent to termination of parental rights . . . was obtained in accordance with applicable foreign law and Article 4 of the Convention." 22 C.F.R. § 96.46(c).

In contesting this conclusion, EAC relies on consular officer Thomas Hayes's notes of his interview with Ms. J, in which Ms. J apparently stated that she did consent to the adoption of her daughter. But notwithstanding Ms. J's technical indications of consent, Hayes's report ultimately concluded, based on other comments that Ms. J made, that "it was unclear to the consular officer during the interview if it was truly the biological mother's wishes to give up her child for permanent adoption." AR 32. Moreover, Hayes's ambivalence on the subject was consistent with the testimony of State Department official Kevin Dougherty, who conducted a separate interview in which Ms. J stated that she had been "led to believe that the people were taking my child for the purpose of education" and that she "thought my child would eventually return." AR 33. Ms. J further stated: "I did not want my child to be adopted and taken away forever. . . . I feel as if I [was] tricked. I thought N would be coming home." *Id.* Against the

evidence from these two State Department interviews, EAC introduced two formal documents purportedly indicating Ms. J's consent to the adoption. But the Hearing Officer found "the face-to-face interviews conducted by two State Department officers carrying out their official duties . . . more persuasive than two thumbprint-signed statements by [Ms. J] as she is unable to read or write . . . and there was no testimony or evidence that these statements were obtained reliably." *Id.* EAC might disagree with the Hearing Officer's weighing of the evidence before her, but on "judicial review of agency action, re-weighing the evidence is not the court's function." *United Steel Workers Int'l Union*, 707 F.3d at 325.

The Hearing Officer reasonably found that the primary provider neither adequately supervised Mirembe's efforts to obtain Ms. J's consent to the adoption of her daughter nor independently verified that Ms. J had consented to the adoption. That finding constituted substantial evidence of non-compliance with the regulatory requirements identified above. The finding further constituted "aggravating circumstances indicating that continued accreditation or approval is not in the best interests of the children and families concerned." 22 C.F.R. § 96.85. The Hearing Officer found that Ms. J "did not understand the purported irrevocable consent and did not realize that her daughter would be taken to America and become the daughter of Americans, and that she would not see her again." AR 31. The Hearing Officer further concluded that EAC's failure to verify Ms. J's consent showed "flagrant and dangerous conduct on EAC's part," *id.*, constituted a "serious and grossly negligent violation" of the relevant statutes, *id.*, and demonstrated "egregious disregard for ensuring that children are not taken from their parents unwillingly (that is, abducted) and that EAC only works with true orphans," AR 35. An adoption agency can work few greater harms than facilitating adoptions to which the children's birth parents have not consented. Under the circumstances, the Court agrees with the

Hearing Officer's conclusion that EAC's failure to verify the birth mother's consent to N's adoption was an aggravating circumstance indicating that EAC's continued accreditation would not be in the best interests of the children and families whose adoptions it was facilitating.

In total, the Hearing Officer identified 14 unique violations of 42 U.S.C. § 14944 and 22 C.F.R. § 96, Subpart F. The Court concludes that the above three violations alone constitute substantial evidence that EAC failed to comply with the standards in 22 C.F.R. § 96, Subpart F of the regulations. The Court further concludes that the circumstances of EAC's third violation—the failure to verify Ms. J's informed consent to her daughter's adoption—constituted aggravating circumstances indicating that EAC's continued accreditation would not be in the best interests of the children and prospective families that might interact with EAC going forward. Finally, the Court concludes that all these violations, taken together, constitute a pattern of serious, willful, or grossly negligent failures to comply with the law. Accordingly, EAC's substantive attacks on the Department's decision fail, and the decision to temporarily debar EAC was not arbitrary and capricious on those grounds.

### 2. Procedural Allegations

In addition to contesting the Department's conclusion that EAC's conduct met the IAA's requirements for debarment, Count I contains numerous criticisms of the procedures employed by the Department in debarring EAC. Count I does not clearly specify any legal authority for the claim that these procedures were deficient, instead stating that the Department "acted contrary to the provisions and requirements of the IAA" and that the debarment decision was "not in accordance with applicable law." Am. Compl. ¶ 100. As explained below, though, the IAA incorporates the APA's standard of review, which permits litigants to challenge agency action that they believe is "contrary to constitutional right." 5 U.S.C. § 706(2)(B). And the procedural

allegations contained in Count I reappear verbatim in Count III, which advances EAC's standalone claim under the Due Process Clause. Accordingly, and because EAC has not identified any other legal standards against which the Department's procedures can be evaluated, the Court will construe the procedural allegations contained in Count I as a claim that those procedures violated EAC's rights under the Due Process Clause.

The Due Process Clause provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. v. Courts typically consider three factors in determining whether a due process violation has occurred: (i) the private interest affected; (ii) the risk of an erroneous deprivation of such interest and the probable value of additional or substitute procedural safeguards; and (iii) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). For the reasons explained below, the process afforded EAC, both before and after the issuance of the Notice of Temporary Debarment, did not violate the Due Process Clause.

### a. Pre-Deprivation Process

EAC first contends that the Secretary's actions deprived it of due process because the Department issued EAC its Notice of Temporary Debarment "without any prior notice or opportunity to be heard." Am. Compl. ¶ 14. Contrary to EAC's argument, however, the Supreme Court "has recognized, on many occasions, that where [the government] must act quickly, . . . postdeprivation process satisfies the requirements of the Due Process Clause," particularly where the government "has a significant interest in immediately suspending" entities "who occupy positions of great public trust." *Gilbert v. Homar*, 520 U.S. 924, 930–32 (1997). As the Secretary points out, "there is a well-recognized principle that due process permits [the

government] to take summary administrative action without pre-deprivation process, but subject to a prompt post-deprivation hearing, where such action is needed to protect public health and safety." *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 229 (D.D.C. 2012) (internal quotation marks omitted); *see also Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015) ("[T]here are extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (citation omitted)). In such circumstances, the state has "no constitutional obligation to provide . . . a presuspension hearing," *Gilbert*, 520 U.S. at 933, because the private interest protected under *Mathews* is sufficiently protected by post-deprivation process, *id.* at 934.

This case epitomizes those circumstances. Adoption agencies, charged with the placement and care of vulnerable children, certainly "occupy positions of great public trust," and allegations than an adoption agency has been abusing that trust to the detriment of those children's interests correspondingly create a "significant interest in immediately suspending" it from such a position. *Gilbert*, 520 U.S. at 932. The Notice of Temporary Debarment against EAC contained numerous allegations of serious misconduct that spanned three countries and concerned ten different adoptions. Some of the more serious claims against EAC included allegations that "EAC providers submitted fraudulent documents to U.S. authorities," AR 80; that EAC "made false statements and/or misrepresented material facts to birth families in order to secure their apparent relinquishment of parental rights . . . without knowledge that their consent was being obtained for purposes of adoption," AR 79; that "EAC providers forced [prospective adoptive parents] to pay bribes to Ugandan government officials," AR 84; and that EAC facilitated the adoption of a child by a family who had not undergone the required background check and "[t]he child was then subjected to serious abuse in the home of the"

adoptive parents, AR 85. Given the gravity of these allegations, the Notice of Temporary Debarment clearly implicated the state's "need[] to protect public health and safety," *Cardinal Health*, 846 F. Supp. 2d at 229, justifying EAC's temporary debarment without additional process. And despite the absence of such pre-deprivation process, the temporary debarment was nonetheless "subject to a prompt post-deprivation hearing," *id.*; according to the Debarment Notice, EAC was entitled to request a hearing within 30 days of the debarment notice, and the Department would have held a hearing within 60 days of that request, AR 89.

EAC also questions the legitimacy of the complaints that the State Department received and on which it relied in issuing the Notice of Temporary Debarment. But the debarment decision was the product of numerous corroborating complaints received from almost a dozen EAC clients and describing similar patterns of misconduct that took place across the globe. *See, e.g.*, AR 88 ("As described above, EAC failed to comply with multiple [regulatory] standards . . . in multiple countries and involving several families . . . ."). For these reasons, the Department's actions before EAC's temporary debarment did not deprive EAC of due process.

### 2. Post-Deprivation Process

Likewise, the extensive administrative procedures that EAC was afforded after its temporary debarment more than satisfy the requirements of due process. That post-deprivation process included multiple rounds of pre-hearing briefing and a four-day hearing at which EAC was represented by counsel and received the opportunity to call and confront live witnesses. The hearing was followed by two rounds of post-hearing briefing on factual and legal issues and a written decision of nearly eighty pages in which the Hearing Officer set forth the basis for EAC's debarment in full. Less process than this was required to justify EAC's debarment. *See, e.g.*, *Zevallos*, 793 F.3d at 117 (post-deprivation process was sufficient where agency provided the

"administrative record justifying his designation and allowed him to respond to it on multiple occasions," and where plaintiff was "fully equipped to rebut [the agency's] rationale"). While the private interest at stake—EAC's certification—was undoubtedly significant, the Department's comprehensive procedures provided more than adequate protection for that interest, minimizing any risk of an erroneous deprivation of EAC's certification and obviating the need for any additional procedures to protect against that risk. *See Mathews*, 424 U.S. at 335.

EAC advances a number of specific complaints about the post-deprivation process that it received, but all of them lack merit. *First*, EAC objects to the fact that the Department devised new procedures for this type of adjudicatory proceeding and then applied them for the first time in this case. At the start, it bears mention that the Department specially solicited and received input from EAC in establishing those procedures, and that the Department adopted many of the proposals that EAC advanced, including one particularly important one: that the Department would bear the burden of proof at the hearing. AR 223. More importantly, EAC offers no support for the proposition that administrative procedures implemented for the first time offend due process. Newly developed procedures do not violate due process simply because they are new. Ultimately, EAC never explains how the content of those procedures was inadequate, and because EAC cannot identify any procedural protection required by the Constitution that the Department failed to provide, its argument fails.

*Second*, EAC advances several arguments about the Department's supposed failure to produce relevant documents at the hearing. For example, EAC argues that the Department should have produced notes taken by U.S. consular officers during interviews with the birth parents of some of the children. But the Hearing Officer ordered certain documents to be produced, and the Department complied with those orders. EAC has failed to identify any

specific document in the Department's possession that the Department was obligated to produce but did not.  Next, EAC objects to the timing of some of the Department's productions, claiming that it was unfair for the Department to produce some visa records "less than five days before the Hearing."  Am. Compl. ¶ 92(k).  But the Department produced these documents on the same day the Hearing Officer ordered it to do so, and EAC had ample opportunity to review these records in the days remaining before trial.  Finally, EAC claims that the Hearing Officer should have delayed the hearing in order to allow EAC more time to review the Department's final productions.  *Id.* ¶ 92(m).  But the Hearing Officer had previously issued several additional extensions, and she reasonably decided to stand firm to the scheduled date of the hearing in spite of the last-minute sequence of document exchanges.

*Third*, EAC complains about circumstances related to Exhibit U94, an email from State Department employee Lauren Bishop that contained a redaction covering a case note authored by consular officer Thomas Hayes.  *Id.* ¶ 92(l).  But the Department recognized that the exhibit was improperly redacted and corrected the error by releasing an unredacted version prior to the hearing.  *Id.* ¶ 92(l)–(m).  Moreover, any issues with the redaction of Exhibit U94 could not have prejudiced EAC because an unredacted version of the case note was available as part of Exhibit U155, AR 2576, and EAC had the opportunity to examine the author of the note, Hayes, at the hearing, *see* AR 467–72 (Hayes testimony discussing Exhibit U155).  EAC also was not "deprived of due process of law" when the Hearing Officer rejected its request to add Bishop to its witness list after the Department's submission of the unredacted email.  Am. Compl. ¶ 92(s).  EAC had previously removed Bishop from its witness list in response to a request from the Hearing Officer to pare down the number of witnesses it intended to call.  *Id.* ¶ 92(r).  More importantly, Bishop had no personal knowledge of the case note, which Hayes authored, and as

previously mentioned, EAC had every opportunity to examine Hayes about it at the hearing.

*Fourth*, EAC complains about the Department's invocations of law enforcement privilege to withhold certain evidence and the Hearing Officer's acceptance of those privilege claims. *See id.* ¶ 100(p). But the Hearing Officer made clear at multiple points that it would not accept the Department's invocations of the privilege until certain that the privilege properly applied. *See, e.g.*, AR 425 (telling the Department that the testimony "needs to be truly law enforcement sensitive" in order for it to sustain the Department's objection based on the law-enforcement privilege). Ultimately, when all was said and done, the Hearing Officer noted that EAC's counsel had "gotten to question a lot more than most cases would allow a law enforcement officer to be questioned during an active investigation," AR 427, an observation that suggests that EAC was far from unduly prejudiced by the instances in which the Department's invocations of the law-enforcement privilege were sustained.

*Finally*, EAC alleges that the Hearing Officer placed undue reliance on controverted hearsay evidence in reaching its decision. As EAC concedes, "administrative agencies are not barred from reliance on hearsay evidence." *Crawford v. U.S. Dep't of Agriculture*, 50 F.3d 46, 49 (D.C. Cir. 1995). To the contrary, "[s]uch evidence need only bear satisfactory indicia of reliability, and can constitute *substantial* evidence if reliable and trustworthy." *Id.* (internal citation omitted) (emphasis in original). Moreover, every time the Hearing Officer relied on a piece of hearsay, she scrutinized the evidence carefully and explained why she deemed it reliable. *See, e.g.*, AR 21 n. 13 ("The [R Parents'] statements are reliable. They were made under oath to a law enforcement officer. Many statements, including this one, could be potentially incriminating."); AR 52 ("Ms. Ro[]'s testimony has been submitted through a detailed, sworn affidavit. Moreover, many of the details in Ms. Ro[]'s affidavit regarding the

changing of the birth mother's identity are corroborated by the Embassy consular notes."). EAC further complains that the Department produced only three live witnesses at the hearing, suggesting that hearsay played an outsized role. But agencies are entitled to rely on hearsay in administrative proceedings, *see Crawford*, 50 F.3d at 49, and the limited number of live witnesses who appeared at the hearing does not mean that the evidence the Department presented, which did include some hearsay, was not substantial. *See Freeman v. U.S. Dep't of the Interior*, 37 F. Supp. 3d 313, 329 (D.D.C. 2014) ("[S]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. (citation omitted)). EAC also claims that the Hearing Officer should have discounted statements from former EAC clients because those clients were dissatisfied with EAC's services and therefore not disinterested parties. But EAC's former clients were uniquely positioned to provide evidence about EAC's past misconduct, making their testimony particularly probative. And those clients had ceased their relationship with EAC and no longer stood to gain or lose anything tangible as a result of the proceedings against it. For these reasons, the limited role of hearsay at EAC's debarment proceedings did not deny EAC due process.

In sum, EAC's panoply of objections to the Department's debarment decision—both the substantive allegations that EAC's debarment was unjustified under the IAA and the procedural allegations that the Department did not afford it due process in arriving at that decision—are unfounded. Accordingly, the Court will grant the Secretary's motion for summary judgment on Count I of EAC's amended complaint.

### B. Count II

The second count asserts a claim under the APA, which contains a provision authorizing courts to "decide all relevant questions of law." 5 U.S.C. § 706. But "[t]he APA's judicial

review provision also requires that the person seeking APA review of final agency action have 'no other adequate remedy in a court.'" *Sackett v. EPA*, 566 U.S. 120, 127 (2012). Here, EAC availed itself of the judicial review provision contained in the IAA itself for challenging temporary debarments by the Secretary of State. Under section 204(d) of the IAA, "an agency . . . who is the subject of a final action of suspension, cancellation, or debarment by the Secretary under this subchapter may petition the United States District Court for the District of Columbia . . . to set aside the action." 42 U.S.C. § 14924(d). As explained above, that provision incorporates the very standard of review contained in the APA. *See id.* ("The court shall review the action in accordance with section 706 of Title 5."). Because EAC had access to an adequate alternative remedy when it asserted its APA claim, the Court will dismiss EAC's APA claim.

### C. Count III

The third count purports to raise a standalone claim under the Due Process Clause. The IAA incorporates the APA's standard of review, which permits litigants to challenge agency action that they believe is "contrary to constitutional right." 5 U.S.C. § 706(2)(B). As explained above, *see* supra Part III.A.2, all the allegations contained in Count III of the amended complaint also appear in Count I, *compare* Am. Compl. ¶ 110 with *id.* ¶ 100, and the Court has properly construed the procedural allegations contained in Count I as allegations that the Department's procedures violated due process. Because Counts I and III are duplicative, the Court will dismiss Count III. *See, e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010).

**CONCLUSION**

For the reasons stated above, the Secretary's partial motion for summary judgment (as to Count I) and partial motion to dismiss (as to Counts II and III) are GRANTED. Accordingly, EAC's cross-motion for summary judgment is DENIED. A separate order consistent with this decision accompanies this memorandum opinion.

_Dabney L. Friedrich_
DABNEY L. FRIEDRICH
United States District Judge

January 31, 2020